777 P.2d 679

**STATE of Arizona, ex rel. Robert K. CORBIN, Attorney General, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable Gloria G. Ybarra, Judge, Division Criminal Four, Respondent,**

**and**

**EXCEL INDUSTRIES, INC., Harvey Allen Goldvarg, Clyde Arthur Fritz, Wilfred J. Fienhage, Jr., and Ernest Miller, Real Parties in Interest, Respondents.**

No. 1 CA–SA 88–089.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 23, 1988.

Review Granted March 28, 1989.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Crim. Div. and Marty Woelfle, Asst. Atty. Gen., Phoenix, for petitioner.

Allen, Kimerer and LaVelle by Michael Kimerer, Phoenix, for respondent Excel Industries, Inc.

Michael Benchoff, Phoenix, for respondent Harvey Goldvarg.

Debus, Bradford and Kazan, Ltd. by Larry Debus, Phoenix, for respondent Ernest Miller.

Derrick and Jurkowitz by Clark Derrick, Phoenix, for respondent Wilfred Fienhage.

Tom Karas, Phoenix, for respondent Clyde Fritz.

## OPINION

CONTRERAS, Presiding Judge.

This is a special action review of the trial court's order which granted the real parties' in interest motion to remand for a new determination of probable cause. Petitioner requests that the order be vacated. Because we conclude that special action is the proper procedure to seek review of the trial court's order, *see e.g., State v. Jacobson,* 22 Ariz.App. 128, 524 P.2d 962 (1974), and because we conclude that the trial court improperly granted the real parties' motion, we accept jurisdiction and grant the requested relief.

On April 21, 1987, the real parties in interest (real parties) were indicted for alleged violations of the Hazardous Waste Management Act, A.R.S. § 49–921 *et seq.* On May 28, 1987, the real parties timely filed a motion for new determination of probable cause pursuant to Rule 12.9, Arizona Rules of Criminal Procedure, 17 A.R.S. (1987). In this motion, they alleged, among other things, that some of the evidence presented to the State Grand Jury had been obtained through subpoena in "violation of the attorney/client work product and attorney/client privileges."

On December 4, 1987, the trial court conducted an evidentiary hearing regarding the alleged violations. The matter was taken under advisement and supplemental

memoranda were submitted by the parties. On February 2, 1988, the trial court entered a ruling by minute entry in which it found that "given the totality of the circumstances fundamental fairness requires that a new determination of probable cause be made only on evidence properly presented to the Grand Jury." On March 15, 1988, the trial court, in response to the state's request for clarification and motion for reconsideration, denied the motion. The state subsequently filed a petition for special action. Following oral argument, this court issued an order accepting jurisdiction and granting relief by vacating the trial judge's order of February 2, 1988. We noted that a written decision would follow.

## I. JURISDICTION

Appeals by the state are controlled by A.R.S. § 13–4032. Although § 13–4032(1) provides an opportunity for the state to appeal from an order dismissing an indictment, it does not encompass those instances where a motion to remand for a new determination of probable cause is granted; even where, as here, the remand results in a dismissal of the indictment by operation of law pursuant to Rule 12.28.C, Arizona Rules of Criminal Procedure, 17 A.R.S. *See e.g., State v. Fridley*, 126 Ariz. 419, 616 P.2d 94 (App.1980); *State v. Jacobson, supra* (while it did not address its reason for doing so, the court accepted jurisdiction in a special action which attacked the propriety of an order granting a defendant's motion for a new finding of probable cause). Thus, special action is the proper means to seek relief. For that reason, and because we find that the trial court's order will severely prejudice the state, we accept special action jurisdiction.

## II. FACTS

The real parties in interest in this special action are Excel Industries, Inc. (Excel); Harvey Allen Goldvarg, Excel's president; Clyde Arthur Fritz, Excel's vice president; and Wilfred J. Fienhage, Jr., and Ernest Miller, both management employees of Excel. Excel is a manufacturer of cultured marble, with facilities in Phoenix and Tucson. The petitioner is the State of Arizona.

On March 17, 1986, the Arizona Department of Health Services (ADHS) conducted a hazardous waste management inspection of Excel's Phoenix facility pursuant to A.R.S. § 49–921 (at that time, A.R.S. § 36–2821), and on March 25, 1986, sent Excel a copy of the resulting investigation report. In April of 1986, Western Technologies, an engineering consulting firm, sampled and analyzed wastes stored in 55 gallon drums at Excel's Phoenix facility and prepared a report on its findings. The parties refer to this as the "drum study." Robert Scott, who at that time was vice president for environmental affairs at Western Technologies, testified at the December 4, 1987 evidentiary hearing that Excel had hired Western Technologies to do this study because Excel had anticipated a "compliance letter" from ADHS due to the March 17th inspection ADHS had conducted. Excel did, in fact, receive such a compliance letter on May 21, 1986, which requested Excel's compliance with the Arizona Hazardous Waste Management Act. Essentially, it required Excel to make various determinations regarding the possibility of hazardous wastes being located at Excel's Phoenix facility. ADHS further noted that it was aware of the sampling activities conducted for Excel by Western Technologies and told Excel "to have Western Technologies submit directly to ADHS copies of all reports submitted to Excel regarding sampling activities and results." Excel then authorized Western Technologies to submit the drum study report to ADHS, which it did.

Initially, the investigations by the state, through ADHS, were civil in nature; ADHS was seeking Excel's compliance with the Hazardous Waste Management Act. Donald Anderson, of the law firm of Bonn & Anderson, was Excel's corporate counsel during this time. He testified at the December 1987, evidentiary hearing. His testimony was that in April of 1986, Excel had informed him of the ADHS investigation regarding compliance matters. However, in mid-May Excel informed him

that one of its management employees had been contacted by a *criminal* investigator of the State Attorney General's office. Anderson also learned that the Attorney General's office had conducted a soil test in the lot located behind Excel's Phoenix facility.

Because his law firm does not practice criminal law, Anderson contacted Michael Benchoff, a criminal law specialist, in order to obtain assistance in developing the criminal defense aspects of the Excel investigation. Also brought in for assistance was Clark Derrick, another criminal defense attorney. On or about May 30, 1986, Derrick met with David Ronald of the Attorney General's office and was told that the Attorney General would be seeking indictments against Excel and several of its officers and employees. Derrick advised Benchoff and Anderson of this development, and soon thereafter all of the real parties obtained legal counsel. At the request of the Attorney General's office, in early August of 1986, Anderson provided the Attorney General's office with the names of the attorneys involved and their respective clients.

From late-May through July of 1986, the real parties' attorneys attended several meetings that were depicted in Anderson's testimony as "joint defense" meetings, held primarily so the lawyers could educate themselves in this particular area of the criminal law. Robert Scott of Western Technologies attended one such meeting held on June 11, 1986, to educate counsel as to hazardous waste issues in their preparation for the impending criminal litigation. There was also discussion of the lawyers possibly having their own soil test conducted on soil obtained from the property located behind Excel's facility. During a meeting on July 29, 1986, the lawyers decided to contact Robert Scott and direct him to conduct the soil test. Scott was so directed. However, this project was also set in motion, as was the earlier drum study, by Western Technologies submitting a proposal to Excel's vice president, Clyde Fritz. Robert Scott and Donald Anderson both testified that because this test was to be performed solely for the purpose of criminal litigation, it was considered highly confidential and privileged material. Accordingly, Scott created a special job number and file at Western Technologies for this project.

The proposal, which was submitted to Excel on August 12, 1986 basically stated that on April 4, 1986, ADHS took soil samples on property located behind the Excel Phoenix facility and owned by Santa Fe Pacific Realty Corporation. Excel was informed by ADHS that the soil samples were contaminated by several organic compounds. Therefore, additional soil sampling should be conducted to determine the extent of soil contamination. A report was to be prepared documenting all soil sampling activities and all results of chemical analysis. The only recommendations to be given, according to the proposal, were whether additional soil sampling should be done and regarding clean up.

Western Technologies completed the soil testing and prepared a written report. The letter transmitting the report, dated September 24, 1986, was addressed to Excel Industries and to the attention of Clyde A. Fritz, vice president. The letter noted that five copies were also being sent to the addressee. However, real parties contend and Donald Anderson testified that the report and all of the copies were hand delivered to Anderson at his law firm's office. Robert Scott also testified that the report and copies were only delivered to Anderson. Excel paid Western Technologies directly for the services rendered.

The submitted soil report described the chemical contaminants in the soil and their concentrations. It also noted which chemicals were considered to be hazardous wastes. The only conclusions or recommendations made were that the area should be excavated and that a licensed transporter of hazardous wastes should be retained to perform the excavation and transport the contaminated soil to an EPA-approved hazardous waste disposal facility. The report further recommended that additional soil sampling and chemical analysis be conducted following the excavation to assure

that all contaminated soil had been removed.

On December 22, 1986, Western Technologies was served with a State Grand Jury Criminal Subpoena Duces Tecum. It required Western Technologies to submit to the State Grand Jury or, alternatively to Mark Williams, Special Agent for the State Attorney General's office, by January 12, 1987, the following:

"1. Any reports, summaries or other documentation prepared for Excel Industries, Inc. regarding the site at 4636 N. 43re (sic) Ave., Phoenix and the immediate surrounding area, and/or any reports, summaries or other documentation prepared on behalf of any other entity or person."

The subpoena covered the period from January 1, 1983 to November 30, 1986, and thus included the soil test report in question.

The following admonition was rubber stamped on the upper right corner of the subpoena:

DISCLOSURE OF ANY MATTER ATTENDING A GRAND JURY PROCEEDING REQUIRED BY LAW TO BE KEPT SECRET IS A VIOLATION OF A.R.S. 13–2812.

Robert Scott handled the subpoena for Western Technologies. At the December 1987 evidentiary hearing he testified that it alarmed him because he felt it requested him to turn over the soil report, which he considered to contain highly privileged information. Even more disconcerting to Scott was the admonition which, he believed, prevented him from discussing the subpoena with defense attorneys. Scott testified that he asked Western Technologies' lawyer, Charlie Johnson, what he believed the admonition meant, and that Johnson told him he had no choice but to turn the files over to the Attorney General's office.

Scott brought the files, including the soil report, to Special Agent Williams on January 6, 1987. He testified that he expressed to Agent Williams his concern regarding the confidential nature of one of the files he was being compelled to disclose. He said that he questioned Agent Williams about the admonition and about who he could speak with regarding the subpoena and that Agent Williams responded that Scott could not speak to a soul. However, Agent Williams testified that he told Scott he could speak to Marty Woelfle, the assistant attorney general involved in the matter. Williams did not recall having any conversation with Scott regarding the privileged or confidential nature of the reports.

On January 23, 1987, Agent Williams contacted Scott by phone requesting Scott's interpretation of handwritten notes and information contained in the soil analysis file. Scott explained the notes to Williams, and on April 21, 1987, Williams presented this information to the Grand Jury along with summaries of the soil report. Scott testified that the notes in question were his responses to questions the defense attorneys had asked him, and that he considered these notes to be extremely privileged.

Donald Anderson, as Excel's statutory Agent, had also been served with a subpoena during December, 1986, which called for the production of certain records and documents, but did not include a request for the soil report. After he reviewed the requested records, Anderson complied with the subpoena on February 2, 1987.

Scott informed Anderson in early February that he had produced the soil report pursuant to subpoena and that he had responded to Agent Williams' questions. On February 11, 1987, Western Technologies, at the direction of Donald Anderson, sent a revised soil report to the Attorney General's office that corrected errors contained in the initial report. Anderson testified that he would not have done so had the original report not already been sent.

Formal presentation of evidence to the grand jury began on January 12, 1987. Subsequent presentations were made on March 3, and April 21, 1987. Agent Williams testified before the grand jury regarding the soil report on January 12, but summaries of the report were not presented until April 21, 1987.

## III. LAW

In its motion to remand for a new finding of probable cause, the real parties assert that the state obtained evidence through subpoena 'for presentation to the grand jury in violation of both the "attorney-client" privilege,[1] and the "attorney-client work product"[2] privilege. They contend that this denied them a substantial procedural right and, pursuant to Rule 12.9, Arizona Rules of Criminal Procedure, 17 A.R.S., the grand jury proceedings may be challenged.

In a minute entry granting the real parties' motion for an evidentiary hearing, the trial court determined "that violation of the attorney-client privilege can amount to a denial of a substantial procedural right and be the basis for a challenge to the probable cause determination of the Grand Jury," and cited *U.S. v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) and *State v. Superior Court of Pima County,* 125 Ariz. 370, 609 P.2d 1070 (1980) as support. We agree with the trial court's statement of the law. However, we disagree with its ultimate conclusion that the soil report in question here was privileged material.

Petitioner asserts that the materials claimed to be privileged do not fall within (1) the rule establishing protection for attorney work product or (2) the statutory definition of the attorney-client privilege. Petitioner also asserts that the privilege, which the real parties now claim, was not violated because the Attorney General's office had no reason to believe any evidence sought in the subpoena was privileged, and that the subpoena was issued in good faith. Therefore, neither *Calandra, supra* nor *Superior Court of Pima County, supra,* would preclude the grand jury from considering evidence pertaining to the soil report.

In a related argument, petitioner further asserts that the real parties waived any privilege that may have existed because they failed to raise this claim when they first discovered that the soil report had been subpoenaed.

According to the testimony of Donald Anderson, attorneys for the real parties did not learn that the soil report had been subpoenaed until early February, 1987, which was after grand jury proceedings had begun. Real parties contend that by then it was too late to raise a claim of privilege and therefore, pursuant to Rule 12.9(b), Arizona Rules of Criminal Procedure, they had to wait until the indictment had been returned to raise this claim. At oral argument, real parties suggested that the Attorney General's office was aware of the privileged nature of the soil report because it knew that real parties were represented by criminal defense counsel in early August of 1986, and the soil report was not prepared until September of 1986. Finally, they argue that, if not already aware, the Attorney General's office became aware of the privileged nature of the soil report on January 6, 1987, when Robert Scott explained his concerns about confidentiality to Agent Williams. At that point, they contend, the Attorney General's office had a duty to determine whether the real parties had a valid privilege claim before it presented this evidence to the grand jury.

The real parties before the trial court and before this court present a number of interesting issues and seemingly persuasive arguments all of which are premised on the "confidential" nature of the soil report. We need not address these issues since, upon objective analysis and consideration, we have concluded that the soil report in question is not privileged material

1. A.R.S. § 13–4062 Anti-marital fact privilege; other privileged communications.

   A person shall not be examined as a witness in the following cases:

   .  .  .  .  .

   2. An attorney, without consent of his client, as to any communication made by the client to him, or his advice given thereon in the course of professional employment.

2. Rule 15.4(b), Arizona Rules of Criminal Procedure, 17 A.R.S., states in pertinent part:

   b. Materials Not Subject to Disclosure

   (1) *Work Product.* Disclosure shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of ... defense counsel or his legal or investigative staff.

under either the attorney-client privilege or the work product doctrine. We discuss each in turn.

### A. *Attorney–Client Privilege*

█ Section 13–4062, A.R.S. codifies the "attorney-client" privilege in criminal matters. The privilege protects only confidential communications made by the client to the attorney or the advice given to the client by the attorney in the course of professional employment. *See* footnote 1; *Granger v. Wisner*, 134 Ariz. 377, 656 P.2d 1238 (1982) (discussing the similar attorney-client privilege that applies in civil matters pursuant to A.R.S. § 12–2234); *State v. Alexander*, 108 Ariz. 556, 503 P.2d 777 (1972). The alleged privileged "communication" in this matter is the soil report, including Robert Scott's interpretation of handwritten notes contained in the file. The real parties contend that Western Technologies was acting as the defense attorneys' *agent*, and that therefore, the attorney-client privilege attached to the soil report it prepared.

The attorney-client privilege expressed in section 13–4062 does not mention communications between anyone other than the client and the attorney.[3] Caselaw in some jurisdictions recognizes that the privilege "can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put into usable form information obtained from that client." *Federal Trade Comm'n v. TRW, Inc.*, 628 F.2d 207, 212 (D.C.Cir. 1980), citing *U.S. v. Kovel*, 296 F.2d 918 (2d Cir.1961). Even if we were to adopt this view, we are convinced that this limited extension of the privilege to third parties does not apply to the facts before us. Western Technologies did not prepare this report for the purpose of putting into usable form information obtained from Excel. First, the information in the report was not obtained from the client, Excel. Rather, it is an analysis of soil obtained from property located behind Excel's Phoenix facility

and owned by Santa Fe Pacific Realty Corporation. More significantly, the report in no way can be considered a client's communication. It is more like an "expert's observations, conclusions and information derived from sources other than the client's communication ..., which, like the client's knowledge and the attorney's knowledge, is not privileged." 2 J. Weinstein & M. Berger, *Commentary on Rules of Evidence* § 503(a)(3)(01) (1986). The soil report is not privileged material under the statutory attorney-client privilege.

### B. *Work Product Doctrine*

█ The work product doctrine, as it pertains to criminal cases in Arizona, is established and defined by Rule 15.4(b)(1), Arizona Rules of Criminal Procedure. (See footnote 2.) *See also State v. Nunez*, 23 Ariz.App. 462, 534 P.2d 270 (1975). The pertinent part of that rule states that disclosure shall not be required of legal research or records, correspondence, reports, or memoranda if: 1) it was prepared by defense counsel or his legal or investigative staff, *and* 2) it contains the opinions, theories or conclusions of the preparer.

Addressing the first prong of the rule, the real parties contend that Western Technologies acted as part of the joint defense team's investigative staff in preparing the soil report. They point out that Robert Scott of Western Technologies had been directed, by attorney Donald Anderson, after the defense meeting of July 29, 1986, to perform the soil test. This decision was made after defense counsel had held similar meetings, at least one of which Robert Scott had attended and at which the topic of having a soil test conducted had been discussed.

Petitioner, on the other hand, insists that Western Technologies acted pursuant to a contract between itself and Excel, as evidenced by the soil assessment plan proposal that Western Technologies submitted to Excel's vice president on August 12, 1986. Petitioner also points out that Excel paid

---

**3.** A.R.S. § 12–2234, the civil analog to § 13–4062.2 specifically includes an attorney's secretary, stenographer, and clerk.

for the soil report. In addition, petitioner contends that upon its completion of the project, Western Technologies sent the report and five copies to Clyde Fritz, as evidenced by the transmittal letter which is addressed to Excel, and to the attention of Clyde Fritz. However, as previously noted, this was disputed in testimony at the evidentiary hearing. Although not expressly stated, it appears that the trial court settled this factual dispute in real parties' favor.

Assuming Western Technologies did act as part of counsel for real parties' investigative staff, the next question is whether the soil report contains its opinions, theories or conclusions within the meaning of Rule 15.4(b)(1). As stated previously, the soil report describes the chemical contaminants found in the soil and their concentrations and notes which chemicals were hazardous wastes. The only opinions rendered relate to excavation and disposal. It contains no theories, opinions or conclusions regarding how the results may effect the real parties in the criminal litigation. The report makes no reference to any form of litigation.

The comment to Rule 15.4(b)(1) notes that the Rule "adopts a limited work product standard returning to the original conception of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), protecting documents only to the extent that they constitute legal research or the 'theories, opinions or conclusions' of the parties and their agents." It then refers to the ABA Standards (Approved Draft, 1970), with commentary at pages 88–91. This commentary notes that the purpose of the doctrine is to protect counsel's thought processes. It goes on to state that "the report of an attorney [or investigative staff] as to what he had heard, seen or otherwise perceived with his senses or implements would not be protected from disclosure, because the report would reflect information other than his own opinions, theories or conclusions." ABA Standards at 90–91 (Approved Draft, 1970). In our opinion this best describes the soil report prepared by Western Technologies. Therefore, we conclude that the soil report is not a privileged document under the work product doctrine set forth in Rule 15.4(b)(1).

For the foregoing reasons, we vacate the order of the trial court which granted real parties' motion to remand for a new determination of probable cause.

EUBANK and JACOBSON, JJ., concur.